No. 18,826.

ANSELMO RICCI, *Appellee,* v. THE CHEROKEE & PITTS-
BURG COAL & MINING COMPANY, *Appellant.*

### SYLLABUS BY THE COURT.

NEGLIGENCE — *Coal Mine — Insufficient Props — Injuries — Evi-
dence.* In an action against the owner of a coal mine for
personal injuries to a miner caused by a violation of the
statutory duty to furnish sufficient props of suitable length,
the evidence is examined and found sufficient to support the
findings and verdict.

Appeal from Crawford district court; ANDREW J.
CURRAN, judge. Opinion filed May 9, 1914. Affirmed.

*William R. Smith, Owen J. Wood,* and *Alfred A.
Scott,* all of Topeka, for the appellant.

*Arthur Fuller,* and *W. J. True,* both of Pittsburg,
for the appellee.

The opinion of the court was delivered by

BENSON, J.: The plaintiff, a coal miner, was injured
at the defendant's mine on July 29, 1912, by a rock
falling upon him from the roof of the room in which
he was working. He recovered a judgment for $1200,
and the defendant appeals.

The plaintiff was 53 years old at the time of his
injury, and had been working in that mine for eleven
years, and in the same room for about three months.
His room extended northward from the entry for a
distance of 150 or 160 feet. The plaintiff and his son
Theodor were working together. The vein of coal was
two feet and eight inches thick, and that was the
height of the room. The rock which fell was twenty
feet long, six feet wide, and four inches thick, and was
in the roof at the end farthest from the entry, at or
near the face of the coal. Its presence had been known
to the plaintiff for about fifteen days before it fell,

and he had been working under it all that time. There had been three props, each two feet eight inches in length, under the rock the day before the accident, but they had been blown down by the shots fired that night, and the next morning had been replaced by the plaintiff or his son when they commenced work. These props were under the rock when it fell. One prop was placed four feet from each end of the rock, and the third one in the middle of the rock, forming a sort of triangle. When these props were put up that morning, both the plaintiff and his son sounded the rock with their picks, and in the language of the plaintiff, "It did n't sound bad." About half past twelve o'clock that day, after the plaintiff had picked coal under the rock for four or five minutes and had taken out three or four shovelfuls, the rock fell. It broke in two or more pieces, and one of the pieces fell upon the plaintiff's back, bearing him down in a kneeling position. The rock broke off right on top of the props and fell on each side, leaving the props standing. The plaintiff's son and other miners came to his assistance, and lifted the rock and released the plaintiff.

The sole negligence alleged in the petition was the failure of the defendant to furnish prop timbers of suitable length and size, whereby the plaintiff was unable to prop the roof of his room and prevent it from falling. The evidence disclosed that it was the duty of the driver to furnish props at the request of the miners, and that it was the duty of the miners to make their working place safe by the use of the props supplied by the company. The plaintiff testified that on the day in question he had in his room some loose props three and one-half and four feet in length, but claimed that they were too long to put under the rock. At nine o'clock that morning he ordered props two feet eight inches long from the driver. On his second trip thereafter the driver brought a load of props and delivered them at 11 o'clock or 11:30 o'clock at the switch

entering the plaintiff's room, and said to the plaintiff, "There are no two-foot-eight props at the bottom, and I have brought you some three-foot props and some three-and-one-half-foot props." Two or three of the props which the driver brought were three feet long, and the rest were three and one-half feet in length. They were unloaded by the plaintiff and his son. The plaintiff was using in his room props of various lengths, two feet eight inches, three feet, three and one-half feet and four feet long, depending upon the varying height of the roof at different places. Most of the props they were using were two feet eight and three feet long. The floor of the room was composed of a substance called blackjack, from four to ten inches thick. This bottom could be dug out so as to admit of the use of a prop at least as long as three and one-half feet.

The jury found the following additional facts:

"Q. 7.  Did the plaintiff, just prior to the falling of the rock complained of, think that it was safe?  A. Yes.

"Q. 8.  Did the plaintiff, when he went under this rock to mine out the shot, think the rock was safe? A. Yes."

The contention of the defendant is:

"First, that the company had substantially complied with the statute by furnishing props of such a length as could, with proper diligence on the part of the plaintiff, have been used by him in supporting the rock; Second, that even though he had had props of the exact length ordered by him, he would not have used them under this rock, as he considered that it was sufficiently propped already and reasonably safe for him to work under. So it appears conclusively that it was the plaintiff's own negligence, or lack of judgment, and not the want of props, that was the cause of the accident."

These questions were presented to the district court by a demurrer to the evidence and a motion for judgment on the findings. The question here is whether

upon the facts found by the jury, and others which the evidence tends to prove, these contentions of the defendant should be sustained. In other words, whether the findings and verdict are supported by the evidence.

The petition alleges negligence on the part of the defendant in willfully failing to supply sufficient prop timber of suitable length and size for the place where the plaintiff was working, and that this failure was the proximate cause of his injury. The statute, among other things, declares:

"Every mine shall be supplied with sufficient prop timber of suitable length and size for the places where it is to be used, and kept in easy access to." (Gen. Stat. 1909, § 4987.)

The vein of coal was two feet eight inches in thickness, and most of the props used in the room were of that length, longer ones being used at places where the roof varied from its ordinary height. To support the rock in question, however, the length required was two feet and eight inches; and the plaintiff asked for props of that length for that purpose. It is argued that longer ones might easily have been used by excavating places for them in the black jack, constituting the floor of the room, to the depth that might be necessary, and there is evidence that this had been done in other rooms. One witness testified:

"I ought to have used two-foot-eight, but I could not get two-foot-eight; I used three-foot props, and sunk them in the bottom to be safe.

"Q. You used three-foot props in propping up the roof in your room, did you? A. Yes, sir; because there were no two-foot-eight."

There was other testimony of the same nature. The plaintiff testified that to use a three-foot prop he would have to dig up the bottom five inches; that in some places it was too hard to dig; and that he was not paid to sink props; that below the black jack there was

rock, and to use a prop three and one-half feet long would require digging down a foot and a half.

There was evidence tending to show that when the driver came in without any props, after the first order had been made, the plaintiff told him to bring them the next time. When the driver again returned bringing props of a greater length than had been asked for, the plaintiff said, "What did you bring these to me for, they are not serviceable." The evidence did not show a sudden emergency causing an insufficiency in the supply of props of the required length, but tended to prove a condition that had existed for several days.

The defendant contends that the plaintiff was warned of the danger, and was alone responsible for the consequences; and that his failure to use the props he had was the proximate cause of the injury. In support of this contention reference is made to the testimony of the pit boss, who was in Ricci's room between ten and eleven o'clock on the day the rock fell, and testified: "I told him he had a bad rock there, and I told him to take it down, or to put some more props under it, and he said he would watch it himself; and I walked away and went on out of the room." It does not appear that the pit boss apprehended such imminent danger as to require immediate removal of the bad rock, but believed that with further propping work might proceed, and this is consistent with the plaintiff's claim that props were desired for that purpose.

It can not be held as a matter of law that the plaintiff is precluded from a recovery by his failure to dig into the black jack, or rock below, if that was necessary, and in that way use the props that were furnished. But the evidence relating to that matter was material upon the question whether the props so furnished were of suitable length, or reasonably sufficient for use.

Referring to the contention of the defendant that

23—92 KAN.

the plaintiff would not have used the shorter props had they been furnished, it will be observed that he called for them and repeated the call when the driver returned without them. True, he testified that if he had believed that the rock would fall he would not have gone under it. But immediately following this statement he testified:

"Q. Then since you thought the rock was safe, what did you order these props for? A. Because, if he had brought some more props, it would have been safe."

Having also testified that props that had been under this rock were blown down the night before the injury, and were set under it again but in different places that morning, he was asked the question and gave the answer following:

"Q. Well then, did you put anything in the place that these props had been in the day before, so as to hold the rock at that point? A. No sir, I did not have any more."

His son, who had, it seems, placed the three props in position under this rock, testified:

"The reason I did not put up more props under that rock was because I did not have any two-foot-eight props, they were all too long. The length of the props that I did put under the rock was about two-feet-eight. . . . I will not say that there were not any three-foot props. I could not have put a three-foot prop under that rock."

On this and other testimony, and some evidence conflicting with it, the question whether the props would have been placed under the rock had they been furnished was properly left to the jury.

The plaintiff is criticized for incurring the risk of death or serious injury rather than to do the extra work necessary in order to use the props that were furnished. But the jury were not bound to infer that he took that risk while knowing or apprehending the danger. The ordinary motive of self-preservation, and the love of life, suggest a contrary inference.

It must be remembered that contributory negligence is not available as a defense in cases like this where the cause of action arises from the violation of a statutory duty. (*LeRoy v. Railway Co.*, 91 Kan. 548, 138 Pac. 646; *Cheek v. Railway Co.*, 89 Kan. 247, 131 Pac. 617.)

The discussion of the scope and effect of statutes enacted for the protection of life in the cases cited and other recent decisions makes comment upon their interpretation unnecessary. (*Caspar v. Lewin*, 82 Kan. 604, 109 Pac. 657; *Slater v. Railway Co.*, 91 Kan. 226, 137 Pac. 943.) No objection to the instructions or to the rulings, other than those already referred to, is urged.

It is concluded that there is competent evidence to support the findings and verdict, and the judgment is affirmed.